Our third case this morning is No. 15-2063, Merck v. Watson Laboratories Inc., Mr. Maddox. Good morning. I'm Stephen Maddox for Appellant Watson Laboratories Inc. and I've reserved five minutes for rebuttal. To jump right in, there are essentially four findings of fact and conclusions of law that the District Court got wrong. I'd like to talk for as long as you'll let me about two concerning Section 5.2 of the CDA. The first, clearly erroneous, finding of fact was that Weider and Merck both understood at the time that none of the faxes, offers, We're not dealing here with witness credibility. We're dealing here with factual impossibility. Dr. Bucci, the only witness for Weider, testified that he'd never seen or thought of or considered what Section 5.2 meant until he was shown it by litigation counsel in this case. He had no knowledge of it at the time. There's no indication he thought it had any bearing on things. In fact, he had no knowledge of the September 9th offer fax, which had the price terms, quantity delivery, payment terms. Indeed, Dr. Martin, who was his counterpart at the time, testified that he knew there was a CDA in place, but he didn't know what was going on here. What we fundamentally have here is, what do you, the court, do with a CDA provision that no one at the time seemed to think mattered or affected what was going on? What do you do with that now that it's been dug up in litigation? And the question is, what's the effect of it? We say essentially two things. First of all, there's not much you need to do with it because we had a signed, written offer, the September 9th facsimile. Secondly, we say, look, even if that wasn't enough to comply with what was later determined to be this section, this is a case where basically designed for the contract law of waiver. So your brief basically talks about this in terms of waiver, but why does it even apply to this separate offer for sale? It seems to me that that provision covered the joint venture. The joint venture was ending. This offer to buy things and the offer to sell it wasn't made in furtherance of the joint venture. It was seen as an entirely different activity. So why didn't you argue that 5.2 just doesn't apply to this transaction at all instead of doing it in terms of waiver? Absolutely. First, if I may, we argued that it complied with 5.2. Well, right. But your entire brief assumes that it applies and that it either complied or was waived. Sure. But it seems like the better argument is that it just doesn't apply at all. Well, we made that argument in the district court. We made that argument that if you construe it, it doesn't actually apply to this. There were a couple things, though, that complicated that. First of all, the parties still continued to talk about other joint ventures, and so they were relying on the confidentiality being maintained for their other discussions. A single sale is a joint venture. I agree, Your Honor. But the CDA was, in fact, still in effect. It had not been terminated. But the point is, why would any person read 5.2 of the CDA as having anything to do with a single sales transaction? It refers to such a transaction that would seem to be a reference to a joint venture transaction such as contemplated by the CDA. That's absolutely correct. The term such transaction from 5.2 is ambiguous. We look, frankly, at the ambiguity to the conduct of the parties. Well, I don't even think it's ambiguous. Why is it ambiguous? It's talking about the kind of transaction that's contemplated by the CDA. I agree, Judge. It was rejected at the district court because of the reasons I just described, that it was still in effect. But you didn't make the argument on appeal. I did not. Have you waived that? I would think you would have to say yes. So we can't – you think we can't decide that 5.2 just doesn't apply? I think you can decide that. I think I can't argue it. It's not in my brief. Well, the overall issue of whether 5.2 applies here or not is an issue. Yes. This sub-issue may not have been argued. What we argue, as you know, is that, look, it doesn't really matter because what happened after they gave up on their discussions for a joint venture on this product – they had other discussions about other products – is that Weaver said, look, we'd like just to buy two kilograms of this stuff. And because it's a small transaction, we'd like to do the simplest thing we can. And Merck said, in writing back, okay, here's what we're going to do. Here's the simplest way to do this. And Merck internally said and wrote, listen, there's no definitive supply agreement in place. We have no intention of putting one in place, so here's what we do to get this done. Merck decided to proceed without a definitive supply agreement, as may be required with 5.2 if it applies. And Merck, in September 9th, said, here's how you do it. Here's the price. Here's the term. Here's the quantity. Here's the delivery. Here's the payment. Weaver said, great. We're in. Here's our purchase order. Merck, on September 25th, said, and by the way, the fastest way to get delivery of the promised immediate delivery is for you to send it to this subsidiary. Weaver said, great. And on October 8th, Merck confirmed to Weaver that the two-kilogram order had been placed. And then Weaver sat there in the fall of 1998, not at some point in the future, in the fall of 1998, expecting its immediate delivery. That is wavering. When you manifest intent not to insist on strict compliance with something, you can't then come back and say, oh yeah, we're out of it because you didn't comply with it. It's not a question here of Merck saying, well, we didn't object at the time. You shouldn't infer from our silence that we did. Merck affirmatively said, here's how you do it. Follow my instructions. This is how we're going to do this one-off sale. And Weaver followed those instructions and Weaver said, you've got an offer for sale. Frankly, you've got a sale. So that's Section 5.2. It's not clear how central this is or how close this is. There's really no question under your case law and the case law of all the courts dealing with contract that you've got sufficient detail here. You've got the terms, price, quantity, delivery, payment. In fact, in some cases, less than that suffices. There seems to be an argument that, well, look, in this case, those were not sufficiently detailed because the district court said, it's a potentially dangerous drug. And so the district court said, actually, while the law seems settled and predictable that if you've got these basic five terms, if you're dealing with what I'm calling a potentially dangerous drug, by the way, we're talking about a nutritional supplement here. That's folate, folic acid, nothing glamorous. I'm going to say it's not sufficiently detailed unless it has liability provisions for toxicology and patent provisions. And there's two things wrong with that. As a matter of fact, in the September 4th memo, Dr. Martin had said, here's how we're going to do it. With the order of confirmation, you're going to send them the notice that they take this two kilograms at their own risk of toxicology and patent issues. I'm sure you've got some standard language like that lying around from when we send samples to people. Legally, there's just no precedent for it whatsoever. So what was the testimony here about industry practice with respect to these other terms? Sure. That would be Dr. Buchholz, who was the one live witness we got from Merck. His testimony was, first of all, we Merck never do anything without… Well, we don't care what Merck does. That doesn't have anything to do with the party's agreement. But one of the witnesses did testify about industry practice as to what terms you had in these agreements Who was that? That would be Dr. Buchholz. And where did he testify to that? Just a minute, Judge. If you look at Appendix 1291 at 1729. If you'll give me a moment to turn to that page. That's 1291. Are you there? Yeah. Okay. And if you look at 729, starting at line 16, he's asked if he's got some working knowledge of industry standard terms. And then he goes on to say you have logical things, safety, liability. There are many things. Well, all he's testifying to, right, is that these were terms that were in contracts as a matter of industry practice. Right. But he didn't testify that there was an industry practice that you didn't have a contract unless you had these terms. That is correct. And you can see that illustrated in the very next question on 730. Are there other types of transactions that are goes on, supply contracts and so forth. But fundamentally, his testimony obviously wasn't an expert witness. He was a party. His testimony didn't go to what is sufficiently detailed enough to be an offer in this industry. It went to, well, we have supply agreements that have lots of different terms, including liability and so forth. And he went on to testify that we would never have delivered unless we had a definitive supply agreement in place, which, of course, is not the same thing as evidence of industry custom. I should point out that we could not find a case where any court ever said that you need more than those five terms that were there. And in looking at the Lacks case, which is the one they cite for the proposition that you look to the industry, we should point out, first of all, that the Lacks case didn't involve a question of whether you needed more than these five terms. The Lacks case said, listen, and by the way, the Lacks case came at a time of transition. It was decided below under RCA and then Group 1 had come along. The Lacks case said, listen, you've got a whole bunch of solicitation here, but you don't actually have price, quantity, delivery, payment terms. But on remand, since there's been a change in the standard, I suppose you can consider whether there's industry custom that these essential terms, that we view as essential terms, are not required in your particular industry. It was not. Please go ahead and take a chance to see if you can say that in some industries, more should be required to be definite. Getting into your rebuttal. I see. I will sit down. Okay. Thank you, Judge. Mr. McBride.  I want to start with something that you were addressing at the beginning, which is this idea that is it a transaction? And just note that Watson has waived that argument on appeal. Maybe they have, but let's talk about the merits of it. Because on the face of it, it seems to me somewhat difficult to read 5.2 as having anything to do with an individual sales transaction. It seems on its face to be directed to the kind of joint venture that was contemplated by the CDA. Well, I would say it's directed quite broadly towards all transactions between the parties, which were occurring at all different levels. Why would you read it that way? Well, I would say that both Dr. Bucci and Dr. Buchholz testified that they believed that this section of the transaction covered, this section of the CDA, covered all transactions and all the discussions. If it's clear on its face, what do we care what they thought? Well, I would say it's clear on its face. It says a transaction. And, in fact, in the district court's opinion at appendix page 11. Was this such a transaction? It was such a transaction, a transaction that was taking place. Which suggests that it's the kind of transaction that the CDA was directed to. Well, the CDA doesn't distinguish between a definitive, I'm sorry, with a global supply agreement to cover long-term supply and an individual transaction. And these parties, Merck and Weider,  People don't enter into CDAs if they're having individual sales transactions. People enter into CDAs only if they are contemplating a large transaction, right? They enter CDAs when they're engaged in broad-ranging discussions. And in that CDA, they're providing themselves with cover in section 5.2 for any and all transactions coming out of this. And, in fact, if you look specifically at 5.2, it just says a definitive agreement regarding a transaction. And the such a transaction is referring back to that clause, where section 5.2 specifically says, and this is at A1371, unless and until such definitive agreement regarding a transaction between Weider and Merck has been signed by both parties, neither party will be under any legal obligation of any kind with respect to such a transaction. So the such is referring to the transaction, the A transaction, noted in the beginning. And I want to point out that at page A11, where the district court is ruling that this is a transaction, he does, in fact, point to the fact that Weider, in communicating about this transaction, or about these discussions, called it a transaction. Why isn't the fact that nobody mentioned 5.2 at the time that this individual transaction occurred pretty powerful evidence that it didn't have anything to do with the transaction? Well, I think that would defeat the purpose of 5.2. I mean, 5.2 operates in the background for all of these discussions. For example, when Merck and Weider were proposing the actual global supply agreement for which there was a draft, they were exchanging those drafts and having their meetings and communicating about the terms that they did and didn't agree on. They were not constantly invoking 5.2. That's the purpose of having 5.2 in the background, is to provide exactly that kind of protection. And I want to point out, this is not a small transaction. I disagree with that characterization. If you look at Dr. Bucci's email at A5001, he notes that 2 kilograms is 62,500,000 doses of 5-methyl tetrahydrofolate. In fact, he says, obviously, we have to find a place to put all of this. They didn't even have a plan for what they might possibly do if, in fact, this indication of interest ever actually carried forward and was culminated in a definitive agreement signed by both parties. What Watson's trying to do here, Your Honor, ultimately, is they're trying to get you to retry the case on the facts. However they might dress it up as legal error, what they're doing is asking you to substitute your judgment on the facts in a de novo fashion for that of the district court. But it's not a de novo appeal. It is clear error is the standard. And as you said in King Instrumentals Corporation, if the district court's account of the evidence is plausible, that's not clear error. And I would say that in this case, when the district court found that the CDA and 5.2 were in effect in September of 1998, covering this transaction in question, the protections were not intentionally relinquished, the requirements of 5.2 were not met by the September 9 facts, and that that same facts lacked important material interest to return. The offering facts were signed, wasn't it? I'm sorry? The offering facts was signed, wasn't it? The communication of the September 9 facts was signed by Merck, correct. Yeah, so? But it says definitive agreement signed by both parties, and if you want to apply Group 1 and say it has to be an offer capable. It wouldn't count if somebody responded with a signed purchase order? No, Your Honor, I don't believe it would. In this case, when we're talking about a definitive agreement signed by both parties, we're talking about a formal contract that both parties have signed. So if the other party had said, okay, here's our order, and the price is acceptable, here's the quantity, and it's signed, that wouldn't be an agreement signed by both parties? I don't believe so. Restatement, second of contract, section 26, it's not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent. Dr. Martin made clear in his September 9 facts that this purchase order, if it were to be sent, would be subject to confirmation. So there is a further manifestation of assent required. So at best, if there were conclusive evidence that a signed purchase order had been sent, what we would have there is at best maybe an offer to buy requiring a further manifestation of assent on the part of Merck. But one thing is clear is that given the facts as they are now, we do not have a definitive agreement signed by both parties or capable of being made such a definitive agreement signed by both parties. What did Merck mean when they said that the order has been placed? What are you referring to? They had understood that in fact there was the intent to send a purchase order, but if you look at the subsequent sites that are in the record, what you see is as people are unsure, they have to potentially find it. And in fact, if you go to the January 1999 facts, which was the January of 1999 email at A1428, and in fact what Weider says there, the purchase order, if one exists. So there's no clear indication. That's a guy who may or may not have known that there was a purchase order. Well, the person who was sending that email or was on that chain is Gary Jepson. He was the counterparty to Dr. Martin, who was in fact involved in the communications that Watson claimed. Where is their doubt expressed by Merck that there was an order? Merck does not ever actually say we don't know if there is an order. They say we have to look for it. Everything they said seemed to assume that there had been an order. Everything they said indicated they were going to look and see if one exists and where it is. But what we don't have is any indication. Well, it's more than that, isn't it? Aren't there statements by the Merck people that suggest that they assumed there was an order? There are some statements that they are relaying what Weider had told them, that they believed Weider had said there was an order. Could you find it? But again, I want to point out that we don't have the burden of persuasion here to show that no purchase order was sent. We have simply a burden of production, which we have done. Watson has the burden of persuasion to show by clear and convincing evidence that in fact such a purchase order would exist if in fact it were relevant. Well, I don't think so. I don't think so because an offer for sale counts on the on-sale bar as well as a contract. Well, again, I go back, Your Honor, to say that even sending the purchase order would not meet the requirements of Section 5.2 to form in its entirety a definitive agreement signed by both parties. Let's set aside 5.2 for the moment. Let's assume we conclude that 5.2 doesn't apply. Okay. And that this is just an individual sale not covered by that agreement. Isn't the terms of the offer that sets forth the price, the quantity, the delivery, and the like an offer for sale under the on-sale bar? I would say it's not, Your Honor, and the District Court concluded that there were missing material industry standard terms, not just that there were industry standards. The point is there that this wouldn't be a contract without those kind of terms. It may be that it's industry custom to put those terms in to protect both parties, but is there any support that there's no contract for? Well, Dr. Bucci testified, and this is at A1080, is that having, for example, the toxicological data was an important precondition to any agreement. That's irrelevant. The UCC doesn't say there's no contract if there are other terms like this. It talks about price, delivery, quantity, quality as being the essential terms of the contract. As a matter of general UCC law, the fact that there may be other terms that could be put in doesn't make it not a contract. Well, I would argue, Your Honor, that the UCC and the cases that Watson's relying upon, these are cases where you have a so-called battle of the forms, where the parties have engaged in repeated conduct of sale. And the question is now, with no doubt that there is a contract in place in those instances because both parties have executed, how do we now then fill in the missing terms that were overlooked in the course of that commercial conduct? Well, that exactly seems to cut against your argument that under the UCC you can fill in the missing terms by industry custom, but in order to have a binding contract, you don't have to have the missing terms included. Well, there's no instance, Your Honor, in any of the cases that were cited where a third party 17 years later came in and tried to create a contract between two parties. We don't need a contract here, though. We need an offer for sale. Right, but there's no instance here where we have somebody. The UCC fills in the material terms when you have an unambiguous contract and you need to fill in what's missing. You don't have an instance where you have promotional activity of the sort you might have seen in linear tech that would, if it were actually executed, result in a sale, but up to that point it is not itself a binding commercial offer or a binding sale under 102B. Let me see if I can clarify this. Let's put aside 5.2 and let's put aside these missing terms about liability and intellectual property rights. Is there any question that there's an offer for sale here if we put those aside? No, Your Honor, because Dr. Martin very clearly conditioned the purchase order on subsequent confirmation. And that subsequent confirmation is exactly... No, no, no, but an offer for sale is sufficient. If you put aside 5.2 and what you say are missing terms, how could this not be an offer for sale? Because Dr. Martin's fax, independent of 5.2 or any other terms, says that any purchase order in response to that fax would be subject to confirmation. So you need confirmation to get the contract. That doesn't mean you need confirmation to make it an offer. No, I would say under linear tech... Let me ask you a hypothetical. Suppose Merck, and I know this doesn't happen, but it has a big schedule and it just sends it out as a mailer and says, here's our price for all these different drugs. This drug will offer at $50,000 per kilogram. This drug will offer at $10,000 per kilogram. And they publish this. They send it out in a blast email. Is that not an offer for sale of all of those drugs? Not necessarily, Your Honor. I'd say now we're talking about a world like linear tech where this court said the request or the invitation to send a purchase order is inviting an offer to buy, which has to then be accepted. And inviting an offer to buy is not an offer to sell on the part of Merck. So what is that mailer missing? I'm not entirely sure, Your Honor. Well, what do you need to make an offer for sale? I mean, if it has the price and it has the quantity, does it need delivery date? This court said in Fisher Price, or in fact said in Group 1, we're not going to set out rules or even binding guidance. And then Fisher looks to the UCC, and the UCC is explicit. It says there is a contract for the sale of goods when the evidence shows that the parties have agreed to quantity, quality, price, method of payment, and place of delivery. And those were in the facts, right? I'm not sure if all of those are in the facts, or all of those were necessarily in the facts. But the UCC also says in connection, if we look to the restatement of contracts, which this court also relies upon and has cited in its 102B jurisprudence, is that if there is a requirement of a further manifestation of assent, it's not an offer. Dr. Martin clearly said there will be confirmation.  Even if you throw out the missing material terms, and even if you throw out the fact that Section 5.2 came first and unambiguously framed these discussions, the signatory to the CDA, Section 5.2, Dr. Buchholz said, that it required a formal contract signed by both parties, and it was in effect in September of 1998. That's 5.2. Which I'm saying because I believe it covers... Yeah, we're putting aside 5.2. We're putting aside 5.2 and what you say are the missing terms. And the question is, do we have an offer for sale? We do not because of the requirement of a further manifestation of assent on the part of Merck. Coming from where? Coming from both Merck. Dr. Martin said that it would be subject to confirmation. Confirmation of the order, not confirmation of the offer. Confirmation that they would fill the purchase order. So there is no, it was not an automatic feature. Where is this language you're talking about? You mean Dr. Martin's testimony? Yeah. Dr. Martin's testimony is around... But it's not in the fax itself, right? Oh, no, it is in the fax itself. Where is it in the fax itself? The September 9th fax is at A1424. After receiving your order, you will get official confirmation of the order? Yes. And Dr. Martin testified that that was not something that would happen automatically, that it would require that they check. His testimony is irrelevant. We're talking about the face of the document. The document doesn't say, there's no offer until you get a confirmation. It says, here's our offer. If you order something, we'll send you a confirmation. And Dr. Martin made clear, and again, remember, Dr. Martin's a German speaker. Why is, who cares about what Dr. Martin says when we're looking at the face of the document? Because I think it's important since Dr. Martin is not a native English speaker and he was asked specifically what he meant in sending this fax. And he was clear, we were not promising that the purchase order would automatically be filled. It's a requirement of a further manifestation of assent. The purchase order is, at best in that instance, an offer to buy. And we're now in the world of linear tech. I see I've gone past my time. Thank you, Mr. McBride. Thank you, Your Honor. Your Honor, there's just two things. First of all, a question about, there seems now to be a question about, raised about whether the order was placed. I would simply refer you to Appendix 1455. That's the October 8th email, I'm sorry, fax from Dr. Buchholz of Merck to Weider. Saying there's many things in the fax, but one of them is a first order for two kilograms was placed. We say that means what it says it means. The second thing is we've heard a great deal about what Dr. Martin testifies about his fax. There's a side-by-side on page 17 of our reply brief that puts what Merck now says it means versus what it actually says. If you have no further questions, I would sit down. Okay. Thank you, Mr. Maddox. Thank both counsel. The case is submitted.